IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MMK GROUP, LLC,

                            Plaintiff,                    Case No. 3:07 CV 55

        -vs-

                                              <u>MEMORANDUM   OPINION</u>

THE SHESHELLS COMPANY, LLC,
et al.,

                            Defendant.

KATZ, J.

       This case is before the Court on the following motions: Counterclaim/Third Party Defendant Tina Bruce's motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) (Doc. 156); Counterclaim/Third Party Defendants MMK Group, LLC, Me & My Kids, LLC, Charles Pawloski, and Tina Bruce's motion to dismiss Defendants Thermodyn Corporation and James MacMillan's Third Party Complaint and Counterclaims pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 157); and Plaintiff MMK's motion to dismiss Defendants Sheshells Company, LLC, Thomas Hass, and Michael Teadt's Amended Counterclaim pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. 181).  The Court addresses each of these motions below.

**I. Background**

     **A. Procedure**

       MMK Group, LLC, ("MMK") a Georgia limited liability company that markets, distributes, and sells Lilypadz breast shields, commenced this action in January, 2007.  On November 11, 2007, MMK filed a Second Amended Complaint against the following defendants: The SheShells Company ("SheShells"), an Ohio limited liability company; Thomas Hass

("Hass"), the incorporator and registered agent of SheShells; Michael Teadt ("Teadt"), the director of sales for SheShells; Thermodyn Corporation ("Thermodyn"), an Ohio corporation specialized in manufacturing; and James MacMillan ("MacMillan"), the President and Chief Executive Officer of Thermodyn.  (*See* Doc. 139).

On January 7-8, 2008, Defendants Thermodyn and MacMillian (collectively "Thermodyn Defendants") filed an Answer to Plaintiff's Second Amended Complaint, a Counterclaim against MMK, and a Third Party Complaint against Charles Pawloski ("Pawloski") and Tina Bruce ("Bruce").  (*See* Doc. 149, Doc. 150).  MMK now files a motion to dismiss Thermodyn Defendants' claims with regard to Bruce for lack of personal jurisdiction, and a motion to dismiss Thermodyn Defendants' claims with regard to MMK, Pawloski, and Bruce for failure to state a claim.  (Doc. 156; Doc. 157)

On May 28, 2008, Defendants SheShells, Hass, and Teadt (collectively "SheShells Defendants") filed an Answer to Plaintiff's Second Amended Complaint and Counterclaim against MMK.  (Doc. 171; s*ee also* Doc. 15).  MMK now files a motion to dismiss the SheShells Defendants' Counterclaim for failure to state a claim. (Doc. 181).

**B. Facts**

**1.  MMK Group, LLC's Second Amended Complaint**

In the Second Amended Complaint, MMK alleges the facts that gave rise to this suit. MMK explains that in 2002, Bruce invented the re-usable Lilypadz breast shield, a device that prevents breast milk leakage from nursing mothers.  (Doc. 139 at ¶ 10).  To refine and commercialize this idea, Bruce joined with Pawloski, her uncle, to form Me & My Kidz, L.L.C.

("M&MK"), an Ohio limited liability company.[1]  (Id. at ¶ 11).  MMK claims that on September 12, 2002 in Ohio, M&MK entered into a Non-Disclosure Agreement with Thermodyn ("M&MK/Thermodyn NDA").  (Id. at ¶ 17, Ex. B).  The M&MK/Thermodyn NDA permitted Thermodyn to obtain and access M&MK's confidential information, and allowed M&MK to retain ownership over the confidential information.  (Id. at ¶¶ 17-18).  MMK claims that the agreement prohibited Thermodyn and Thermodyn employees from disclosing M&MK's trade secret information and from competing with M&MK for the time period prescribed by the agreement.  (Id. at ¶¶ 19-22).

MMK alleges that as a result of the M&MK/Thermodyn NDA, Thermodyn manufactured Lilypadz and shared confidential information with its employees, including Hass.  (Id. at ¶¶ 24-27).  MMK alleges that in October, 2004, Hass performed a marketing survey using Lilypadz to test the viability of launching SheShells Breast Coverlets as a competing product.  (Id. at ¶ 30).  MMK states that Hass did so under a company called "Solutions Direct" and without M&MK's knowledge.  (Id. at ¶ 30).  In early 2005, MMK claims that while Hass was an employee of Thermodyn, Hass was in the process of negotiating a contract to sell Lilypadz to Boots, a United Kingdom retailer.  (Id. at ¶ 33).  M&MK asked Thermodyn to cease the negotiations.  (Id.).

In late 2004, MMK alleges that Thermodyn intended to start charging M&MK a significantly higher manufacturing fee, and MacMillian desired to obtain ownership over M&MK's pending patent or control over MMK.  (Id. at ¶¶ 31-33).  Around June 14, 2005, MMK claims to have asked if Thermodyn would consider selling their Lilypadz production equipment.

---

[1]

 On June 27, 2005, M&MK distributed all of its assets to its members, Bruce and Pawloski, who in turn contributed those assets to MMK, a Georgia limited liability company.  MMK now markets, distributes, and sells Lilypadz.  Doc. 139 at ¶¶ 2, 11 fn. 1.

(Id. at ¶ 34).  On or about June 23, 2005 through June 25, 2005, MMK alleges that MacMillian, acting on behalf of Thermodyn, considered, for the first time, the relationship between Thermodyn and M&MK to be a joint venture, and threatened to stop production unless MMK: (1) provided increased financial benefits; (2) handed over all patent information; (3) wrote a letter indemnifying Thermodyn from any law suits.  (Id. at ¶ 35-37).  On June 27, 2005, MMK claims to have agreed to comply with Thermodyn's requests if Thermodyn would meet all standing production orders.  (Id. at ¶ 38).  On June 28, 2005, MMK alleges that MacMillian acknowledged receipt of the requested information and made an offer to MMK for the sale of the materials, inventory, equipment, and expertise to manufacture Lilypadz for $150,000.00. (Id. at ¶¶ 39-40).

On July 1, 2005, MMK claims that M&MK notified Thermodyn of its intention to terminate their relationship.  (Id. at ¶ 41).  On July 25, 2005, M&MK removed its materials from Thermodyn's building.  (Id. at ¶ 43).  In the months before and after this termination, MMK believes that Hass created SheShells and began marketing SheShells Breast Coverlets in direct competition with Lilypadz breast shields and in violation of the M&MK/Thermodyn NDA and MMK's trade secrets.  (Id. at ¶¶ 46-49).

MMK alleges fifteen counts against Defendants under federal and state law, including: federal common law trade dress infringement and false advertising under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and (b); trade secret misappropriation under the Ohio Trade Secrets Act, R.C. § 1333.61 *et seq.*; unfair competition arising under the laws of the state of Ohio; willful false and deceptive trade practice under the Ohio Deceptive Trade Practices Act, R.C. § 4165 *et seq.*; predicate acts of mail and wire fraud, interstate transportation and sale of stolen goods or property in civil violations of the Racketeering Influenced and Corrupt Organizations Act; violation of the

4

Ohio Corrupt Activity Act, R.C. § 2923.31 *et seq.*; tortious interference with business relations; tortious interference with a contract; unjust enrichment; misappropriation and conversion; and patent infringement.

## 2. Thermodyn Defendants' Answer, Counterclaim, and Third Party Complaint

Thermodyn Defendants claim to have had no knowledge of the M&MK/Thermodyn NDA until MMK informed Thermodyn Defendants of the agreement when relations between them began to decline in 2005. (Doc. 150 at ¶¶ 9, 18). The Counterclaim and Third Party Complaint allege that a memorandum titled "Thermodyn and M&MK Relationship," and a November 8, 2002 letter from Pawloski to Thermodyn defined the relationship between Thermodyn and MM&K and are evidence that the companies had a joint venture. (Id. at ¶¶ 7-9). Thermodyn states that it invested over $160,000 in the joint venture and added numerous modifications to the Lilypadz product. (Id. at ¶¶ 10-11). In June, 2005, Thermodyn Defendants state that MacMillan requested the Lilypadz insurance policy and patent information from Pawloski. (Id. at ¶ 12). Thermodyn alleges that Pawloski failed to provide the information and on June 29, 2005, Pawloski, Bruce, MMK, and M&MK unilaterally terminated the joint venture by removing material from the Thermodyn facility. (Id. at ¶ 14). After this exchange, Thermodyn alleges that MMK presented the M&MK/Thermodyn NDA to Thermodyn for the first time in order to prevent Thermodyn from producing anymore Lilypadz. (Id. at ¶¶ 17-19).

Thermodyn Defendants claim that they are entitled to damages because M&MK, MMK, Bruce, and Pawloski caused a breach of joint venture, and tortious interference with business relations. It is these claims to which Bruce, Pawloski, and MMK have responded with: (1)

Bruce's motion to dismiss for lack of personal jurisdiction, and (2) Bruce, Pawloski, and MMK's motion to dismiss for failure to state a claim.  (Doc. 156; Doc. 157).  The Court addresses both of these motions below.

### 3. SheShells Defendants' Answer and Counterclaim

The Answer and Counterclaim allege that in March, 2003, MMK entered into a joint venture with Thermodyn and that this joint venture was eventually managed by Hass as an employee of Thermodyn.  (Doc. 15 at ¶¶ 9-11).  In September, 2004, Pawloski gave Hass permission to sell Lilypadz in the United States and other countries, which caused Hass to enter negotiations in October, 2004 with Boots, the United Kingdom retailer interested in the nursing side of the product.  (Id. at ¶ 11).  SheShells Defendants claim that Hass's effort to sell Lilypadz to Boots ended when Pawloski expressed uncertainty regarding whether he wanted to allow the business to proceed in the nursing area.  (Id.).  SheShells Defendants allege that MMK refused to sign a joint venture agreement with Thermodyn in July, 2005 to memorialize a previous verbal agreement to enter a joint venture.  (Id.).

While SheShells Defendants admit that SheShells was created in June, 2006 to market, distribute, and sell its product, it believes to have competed lawfully with both MMK and all other breast shield products competitors.  (Id. at ¶ 15).  SheShells Defendants claim that while Hass was employed by Thermodyn, he was never informed about and had never seen the M&MK/Thermodyn NDA and that the first time he saw the agreement was July 18, 2005 following a conversation between Hass and Pawloski.  (Id. at ¶ 16).

SheShells Defendants allege the following counterclaims against MMK: unfair competition, illegal attempt to monopolize and violations of the federal antitrust laws, breach of

6

contract, promissory estoppel, and unjust enrichment.  (*See* Doc. 15; Doc. 171).  It is these claims to which Plaintiff MMK has responded with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  (Doc. 181).  The Court addresses this motion below.

## II. Personal Jurisdiction

Bruce, a North Carolina resident and 50% owner of MMK, submitted an affidavit to the Court stating that she has never owned real property in Ohio, nor has she had an individual bank account or phone number in the state.  (Bruce Aff. at ¶¶ 4-7).  The affidavit states that Bruce was not involved in negotiating the relationship between MMK, nor did Bruce send unsolicited communications to Thermodyn, an Ohio corporation.  (Id. at ¶¶ 10, 13).  Bruce also states that she did not participate in the removal of MMK's materials from Thermodyn's Ohio facility or attempt to enforce any agreements between MMK and Thermodyn.  (Id. at ¶¶ 16, 23).

Thermodyn Defendants argue that the Court may exercise personal jurisdiction over Bruce because Bruce: (1) "was president and controlling member of [M&MK]"; (2) "solicited business on behalf of [M&MK]"; (3) "was a party to a non-disclosure agreement in Ohio"; (3) "actively contracted in Ohio on behalf of [M&MK] by signing non-disclosure agreements in Ohio which included an Ohio forum selection clause"; (4) "caused tortious injury in Ohio by terminating the joint venture with Thermodyn and clandestinely attempting to transfer all of the assets of [M&MK] to [MMK]"; (5) sent letters into Ohio; (6) visited Ohio; (7) sent emails into Ohio; and (8) commenced litigation in Ohio.  (Doc. 64 at p. 8).

Bruce argues that this Court should refuse to exercise personal jurisdiction over her because (1) under the fiduciary shield doctrine, any actions taken by Bruce as a corporate officer of MMK are immune from consideration; (2) the Court has no basis for jurisdiction under the

7

Ohio long-arm statute; and (3) the exercise of jurisdiction would fail to comport with the requirements of fair play and substantial justice under the Due Process Clause.

### A. Standard of Review

With regard to Bruce's motion to dismiss, "[t]he procedural scheme which guides the district court in disposing of Rule 12(b)(2) motions is well-settled." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). The plaintiff bears the burden of establishing the court's personal jurisdiction over the defendants. *Id.*; *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). A plaintiff may not stand on its pleadings alone to meet this burden; he or she must "set forth specific facts showing that the court has jurisdiction." *Theunissen*, 935 F.2d at 1458.

"Presented with a properly supported 12(b)(2) motion and opposition, the court has three procedural alternatives: it may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." *Theunissen*, 935 F.2d at1458 (citing *Serras v. First Tennessee Bank Nat'l Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)). The method selected is left to the discretion of the district court. *Id.*

"When . . . a district court rules on a jurisdictional motion to dismiss . . . without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff . . . To defeat such a motion, [the plaintiff] need only make a prima facie showing of jurisdiction. Furthermore, a court . . . does not weigh the controverting assertions of the party seeking dismissal . . ." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir. 1998) (quoting *CompuServe*, 89 F.3d at 1262). Dismissal is only proper if all the

facts taken together fail to establish a prima facie case for personal jurisdiction.  *CompuServe*, 89

F.3d at 1262.

### B. Discussion

In a diversity case, such as this, "[t]o determine whether personal jurisdiction exists over a

defendant, federal courts apply the law of the forum state, subject to the limits of the Due Process

Clause of the Fourteenth Amendment."  *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir.

2000); *CompuServe*, 89 F.3d at 1262.  That is, personal jurisdiction exists over a nonresident "if

the defendant is amenable to service of process under the [forum] state's long-arm statute and if

the exercise of personal jurisdiction would not deny the defendant[ ] due process." *Bird v.*

*Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (quoting *Michigan Coalition of Radioactive Material*

*Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992)).  Ohio's long-arm statute does not

extend personal jurisdiction to the limits of due process.  *Goldstein v. Christiansen*, 70 Ohio St.3d

232, 238, 638 N.E.2d 541 (1994); *see also Glasstech, Inc. v. TGL Tempering Systems, Inc.*, 50

F.Supp.2d 722, 725 (N.D. Ohio 1999). "Plaintiff, therefore, must show: (1) the defendant is

amenable to suit under Ohio's long arm statute, and (2) allowing the defendant to be sued in Ohio

does not contravene due process." *CompuServe*, 89 F.3d at 1262.

### 1. Fiduciary Shield Doctrine

As a preliminary matter, the Court addresses Bruce's argument that this Court is precluded

from exercising personal jurisdiction over her based on the fiduciary shield doctrine.  The

fiduciary shield doctrine generally prevents the exercise of personal jurisdiction over a corporate

fiduciary whenever an out-of-state individual's contacts with the forum state occur by virtue of his

9

or her acts as a fiduciary.  *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 902 (2d Cir. 1981).

The Sixth Circuit confronted this issue in *Weller v. Cromwell Oil Co.*, and held that jurisdiction over a corporate officer cannot be predicated merely upon jurisdiction over the corporation.  504 F.2d 927, 929 (6th Cir. 1974).  More recently, in *Balance Dynamics Corp. v. Schmitt Indus. Inc*., the Sixth Circuit clarified the fiduciary shield doctrine by expressing agreement with courts that exercised personal jurisdiction over corporate officers where the officers were personal, active participants in allegedly tortious or violative conduct.  204 F.3d 683, 697-98 (6th Cir. 2000) (citing *Chattanooga Corp. v. Klingler*, 704 F.2d 903, 906-07 (6th Cir. 1983); *Serras*, 875 F.2d at 1217.

The *Balance* court stated that "[w]hile it is true that 'jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation,' . . . we hold that the mere fact that the actions connecting defendants to the state were undertaken in an official rather than personal capacity does not preclude the exercise of personal jurisdiction over those defendants." 204 F.3d at 698 (citing *Weller*, 504 F.2d at 929).  The Sixth Circuit explained that "where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend on traditional notions of fair play and substantial justice; i.e. whether she purposefully availed herself of the forum and the reasonably foreseeable consequences of that availment."  *Balance Dynamics Corp.*, 204 F.3d at 697-98.

Here, as 50% owner of MMK, Bruce is a fiduciary of the company.  *See Groob v. Keybank*, 108 Ohio St.3d 348, 351, 843 N.E.2d 1170 (2006) (a fiduciary is a "person having a

10

duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking"). Thermodyn Defendants allege that Bruce engaged in tortious conduct. MMK argues that Bruce has only acted as a fiduciary corporate officer and is protected by the fiduciary shield doctrine. However, as explained in *Balance*, the fiduciary shield doctrine does not by itself preclude this Court from exercising personal jurisdiction over Bruce. Nonetheless, jurisdiction over Bruce cannot be predicated merely upon the Court's jurisdiction over MMK. As a result, the Court takes Bruce's role as a fiduciary into consideration in its due process analysis below.

### 2. Ohio's Long-Arm Statute

The Ohio long-arm statute, Ohio Rev.Code § 2307.382(A), states that:

A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's: (1) Transacting any business in this state; (2) Contracting to supply services or goods in this state; (3) Causing tortious injury by an act or omission in this state; (4) Causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; . . . (6) Causing tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he might reasonably have expected that some person would be injured thereby in this state;

In this case, Thermodyn Defendants argue that Ohio's long arm statute reaches Bruce because she transacted business in Ohio, contracted in Ohio, and caused tortious injury in Ohio.

The Ohio Supreme Court has stated that "R.C. 2307.382(A)(1) and Civ.R. 4.3(A)(1) are very broadly worded and permit jurisdiction over nonresident defendants who are transacting any business in Ohio ." *Muzzin v. Brooks*, 168 Ohio App.3d 231, 236, 859 N.E.2d 584, 588 (2006); *Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St.3d 73, 75, 559 N.E.2d 477 (1990). "'Transact,' as defined by Black's Law Dictionary (5 Ed.1979) 1341, '[] means to

11

prosecute negotiations; to carry on business; to have dealings []. The word embraces in its meaning the carrying on or prosecution of business negotiations but it is a broader term than the word 'contract' and may involve business negotiations which have been either wholly or partly brought to a conclusion[].'" *Kentucky Oakes Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St.3d 73, 75, 559 N.E.2d 477, 480 (1990), *cert. denied*, 499 U.S. 975, 111 S.Ct. 1619, 113 L.Ed.2d 717 (1991). Moreover, "personal jurisdiction does not require physical presence in the forum state." *Goldstein v. Christiansen*, 70 Ohio St.3d 232, 236, 638 N.E.2d 541, 544 (1994).

Thermodyn Defendants allege, among other things, that Bruce was president and controlling member of a M&MK, a two member Ohio limited liability company that sold products in Ohio. Thermodyn Defendants also allege that Bruce solicited business in Ohio, contracted in Ohio, and signed a non-disclosure agreement which included an Ohio forum selection clause. Assuming without deciding that, due to the broad scope of "transacting business," these allegations are enough to meet the requirements of Ohio's long-arm statute under R.C. 2307.382(A)(1), this Court turns to the question of whether the Court's exercise of personal jurisdiction would comport with the Due Process Clause.

### 3. Due Process Analysis

The Court must consider whether the exercise of personal jurisdiction over Bruce would comport with the Due Process Clause. Personal jurisdiction may be based on either general or specific jurisdiction. *Bird*, 289 F.3d at 873. "General jurisdiction is proper only where 'a defendant's contacts with the forum state are of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state.'" *Id.* at 738 (quoting *Third Nat'l Bank in Nashville v. WEDGE*

12

*Group Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989)).  In contrast, specific jurisdiction is proper under circumstances "where a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Id.* at 874 (*quoting Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)).  Specific jurisdiction may be based on a single act.  *Nationwide*, 91 F.3d at 794 (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 222, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957)).

### a. General Jurisdiction

First, the Court considers whether it may exercise general jurisdiction over Bruce. Thermodyn argues that Bruce conducted systematic and continuous operations in Ohio by: soliciting business and contracting in Ohio, entering into a joint venture in Ohio, manufacturing in Ohio, and sending letters and emails into Ohio.  Even assuming these allegations are true, such contacts fail to justify the exercise of general jurisdiction over Bruce.

In *Perkins v. Benguet Consolidated Mining Company*, the United State Supreme Court concluded that there were sufficient contacts to support the exercise of general jurisdiction, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952).  The facts of the case at bar are not analogous to the facts in *Perkins*.  In *Perkins*, the president of a nonresident defendant corporation maintained an office in Ohio where he kept company files and held meetings.  *Id.*  Additionally, the president carried on correspondence relating to the business, distributed salary checks drawn on two active Ohio bank accounts, engaged an Ohio bank to act as transfer agent, and supervised policies dealing with the rehabilitation of the corporation's properties in the Philippines. *Id.* at 415.

Here, in contrast to the facts in *Perkins,* Bruce's contacts with Ohio were minimal.  The two correspondences Thermodyn Defendants allege Bruce sent to solicit business and contract in

Ohio were a letter drafted by Pawloski to Thermodyn and an email in which Bruce expressed her lack of knowledge of the deterioration of MMK and Thermodyn's relationship.  Bruce may have visited the Thermodyn facility and may have been aware of some information regarding the manufacturing of Lilypadz, but Bruce did not maintain any kind of regular contact with Thermodyn.  Bruce did not live in Ohio, and did not own property or have a personal bank account in Ohio.  Bruce was tenuously involved in MMK's relationship with Thermodyn.  Her contacts with Ohio were not "of such a continuous and systematic nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state."  *See Third Natl. Bank in Nashville*, 882 F.2d at 1089 (internal quotation marks omitted); *Bird v. Parsons*, 289 F.3d 865 (6th Cir. 2002); *see also Reynolds v. International Amateur Athletic Federation*, 23 F.3d 1110, 1118-1119 (6th Cir. 1994) (holding that where defendant did not regularly transact or solicit business in Ohio or "engage in any other persistent course of conduct," jurisdiction would not be found) (quoting O.R.C. § 2307.382(A)(4))*; see also Nationwide Mutual Insurance Co. v. Tryg International Insurance Co.*, 91 F.3d 790, 794 (6th Cir. 1996) (finding no basis for general jurisdiction where defendant sent a letter to plaintiff assuming an interest in a business venture, entered into subsequent agreements, solicited additional business from plaintiff, and profited from its contacts with Ohio).

### b. Specific Jurisdiction

Specific jurisdiction exists if Bruce's contacts with Ohio satisfy the following test: "First, the defendant must purposefully avail himself [or herself] of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the

14

defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Southern Machine Co. v. Mohasco Indus., Inc*., 401 F.2d 374, 380 (6th Cir. 1968).

### I. Purposeful availment

"This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts. There is a difference between what *World-Wide Volkswagen* [444 U.S. 286 (1980)] calls a mere 'collateral relation to the forum State,' and the kind of substantial relationship with the forum state that invokes, by design, 'the benefits and protections of its laws.' An understanding of this difference is important to the proper application of the 'purposeful availment' test. *Calphalon Corp.*, 228, F.3d at 721-722.

Bruce has not purposefully availed herself of the forum state.  The only evidence or allegation that Bruce solicited business in Ohio is a letter written on November 8, 2002 from Pawloski to Thermodyn in which Pawloski writes that "[Bruce] and I would like to thank you . . . for . . . your continued enthusiasm" and "[w]e want to see both Thermodyn and [M&MK] successfully benefit from this venture." (Doc. 150 at ¶ 7; Doc. 164 at Ex. D). This letter has two important characteristics.  First, Bruce did not draft or sign the letter.  Second, the content of the letter does not indicate that Bruce herself played a part in soliciting business in Ohio.

Furthermore, other evidence indicates that Pawloski, not Bruce, established and ended the business relationship between Thermodyn and M&MK.  The Counterclaim states that Pawloski, not Bruce, approached Thermodyn regarding a business opportunity.  (Doc. 150 at ¶¶ 5-6).  In addition, Thermodyn Defendants claim that MacMillan requested the Lilypadz insurance policy

and patent information from Pawloski, not Bruce. (Id. at ¶ 12). Thermodyn Defendants also allege that Pawloski, not Bruce, failed to provide the information. (Id. at ¶ 13). Thermodyn has brought no evidence to oppose Bruce's statements that Bruce did not: (1) participate in removing materials from Thermodyn's facility, (2) cease to provide Thermodyn with requested information; (3) participate in terminating MMK's relationship with Thermodyn. (Bruce Aff. at ¶¶ 16-22); s*ee Weller v. Cromwell Oil.*, 504 F.2d 927, 929-30 (6th Cir. 1974) ("Where [a motion to dismiss for personal jurisdiction] is filed, supported by affidavits, the non-moving party may not rest upon allegations or denials in his pleadings but his response by affidavit or otherwise must set forth specific facts showing that the court has jurisdiction").

In *Balance,* the Sixth Circuit stressed that "'jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation,'" and that courts may exercise personal jurisdiction over corporate officers where the officers were personal, active participants in allegedly tortious or violative conduct. 204 F.3d at 698 (citing *Weller*, 504 F.2d at 929). Here, there has been no showing of such active participation in the allegedly tortious conduct.

### ii. Related to the operative facts

Under the second prong, where "a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contacts." *CompuServe*, 89 F.3d at 1267. Thermodyn Defendants allege that Bruce was a party to a non-disclosure agreement in Ohio, and signed another non-disclosure agreement which included an Ohio forum selection clause. The non-disclosure agreement to which Bruce was a party was dated June 25, 2002 and makes no mention of Thermodyn. The non-disclosure agreement that

16

included an Ohio forum selection clause was dated November 29, 2001 and was between M&MK and Speciality Silicone Products, Inc.  Neither non-disclosure agreement submitted by Thermodyn relate to the operative facts of this controversy.  *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 722 (6th Cir. 2000) (mere existence of a contract between Rowlette and an Ohio citizen for seventeen months is insufficient to confer personal jurisdiction); *Bradford Co. v. Afco Manufacturing*, 560 F.Supp.2d 612, 621 (S.D. Ohio 2008) (consent to forum's jurisdiction in forum selection clause of contract did not constitute waiver of jurisdiction in cause of action not arising out of that agreement).

### iii. Substantial connection with forum state

The third prong requires the Court to consider whether "the consequences of the act or breach caused by the defendant have a substantial enough connection with the forum state." *Calphalon*, 228 F.3d at 724.  Factors which a trial court may consider include "the burden on the defendant, the interest of the forum state, the plaintiff's interest in obtaining relief, and the interest of other states in securing the most efficient resolution of controversies." *CompuServe*, 89 F.3d at 1268.

Thermodyn Defendants' cannot show that Bruce had a substantial connection to Ohio. Thermodyn Defendants' interest in obtaining relief is preserved because the Court has only decided not to exercise personal jurisdiction over Bruce.  The forum state's interest is preserved because the causes of action alleged by Thermodyn Defendants that arise from contacts with Ohio shall continue to be litigated in the state.

### III. Failure to State a Claim

#### A. Standard of Review

Fed.R.Civ.P. 12(b)(6) provides for dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." To warrant dismissal, "it [must] appear[ ] beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "A district court considering a defendant's motion to dismiss under Rule 12(b)(6) must construe the complaint in the light most favorable to the plaintiff and accept the plaintiff's allegations as true." *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). However, it is unnecessary for the court to "accept as true legal conclusions or unwarranted factual inferences." *Kottmyer*, 436 F.3d at 688 (citing *Gregory v. Shelby County*, 220 F.3d 433, 446 (6th Cir. 2000)).

### 1. Motion to Dismiss Thermodyn Defendants' Counterclaims

### a. Count I: Breach of Joint Venture

Under Ohio law, a joint venture is a partnership established for the purposes of a single business enterprise. *Anchor v. O'Toole*, 94 F.3d 1014, 1024 (6th Cir. 1996). The essential elements of a partnership are as follows: (1) an express or implied partnership contract between the parties; (2) the sharing of profits and losses; (3) mutuality of agency; (4) mutuality of control; and (5) the co-ownership of the business and of the property used for partnership purposes or acquired with partnership funds. *Id.* (citing *Cooke v. Pointer Oil Co. of Florida*, 1981 WL 6439, at *9 (Ohio.Ct.App. Oct. 14, 1981) (unpublished disposition)). The essential elements of a joint venture partnership are similar: (1) a joint contract; (2) an intention to associate as joint venturers; (3) community of interest and control, including contributions to the joint venture; (4) the mutual right to direct and control the purpose of the joint venture; and (5) an agreement for the division of

18

profits and losses jointly, not severally. *Id.* (citing *L & H Leasing Co. v. Dutton*, 82 Ohio App.3d 528, 612 N.E.2d 787, 790 (1992)).  A joint venture is distinguished from a partnership because the former relates to a single enterprise and the latter to a continuing business.  *Silver Oil Co., Inc. v. Limbach*, 44 Ohio St.3d 120, 123 (1989).

MMK argues that Thermodyn alleges insufficient facts to establish the existence of a joint venture.  The Court disagrees.  Under the first element of a joint venture, Thermodyn must allege a set of facts in support of the existence of "a joint contract." *Anchor v. O'Toole*, 94 F.3d at 1024. MMK argues that the November 8, 2002 letter from Pawloski to the marketing director of Thermodyn and the "Thermodyn & M&MK Relationship" document cannot be construed as a joint contract because they do not satisfy the requirements of a contract under Ohio law. However, it is not necessary for Thermodyn to submit a single written contract or document to establish a joint contract.  To establish an implied contract under Ohio law, a plaintiff must prove each of the elements of a contract, i.e. an agreement, based on a meeting of the parties' minds and mutual asset, to which the parties intended to be bound.  *See Penwell v. Amherst Hosp.*, 84 Ohio App.3d 16, 21, 616 N.E.2d 254, 258 (1992).  A plaintiff need not show that the parties formally exchanged promises. Instead, a "contract implied in fact may be proved by showing that the circumstances surrounding the parties' transactions make it reasonably certain that an agreement was intended." *Lucas v. Costantini*, 13 Ohio App.3d 367, 369, 469 N.E.2d 927, 929 (1983).

Here, Thermodyn has alleged facts necessary to support a claim that the various documents submitted to the Court as well as the conduct of the parties establish a "joint contract."  *See Mill Creek Builders, Inc. v. Waltz Custom Builders*, 1991 WL 270419, at *3

19

Lucas App. No. L-90-316, (Dec. 20, 1991) (unreported) (finding an agreement and the conduct of the parties sufficient to find a joint agreement).  A letter from Pawloski to the marketing director of Thermodyn described Thermodyn as a "long-term strategic partner and supplier of our LilyPadz product . . . we want to see both . . . benefit from this venture."  (Doc. 150 at ¶ 7;  Doc. 157 at Ex. A).  The letter goes on to set the target cost "of $3.75 per finished unit and for Thermodyn to have at least a 40% manufacturing margin."  The "Thermodyn & M&MK Relationship" document states that M&MK and Thermodyn intend to have a "transparent" relationship and explains the roles of each company: which will maintain the raw materials, how inventory shall be calculated, and how profit margins shall be calculated.  (Doc. 150 at ¶ 8; Doc. 157 at Ex. B).  Furthermore, the conduct of the parties is notable.  Neither party disagrees that Thermodyn did in fact manufacture Lilypadz for several years, and Thermodyn Defendants allege that over "several years" Thermodyn invested $160,000 in equipment and staffing for the project. (Doc. 150 at ¶ 10).

Under the second element of a joint venture, Thermodyn must allege a set of facts in support of "an intention to associate as joint ventures." *Anchor v. O'Toole*, 94 F.3d at 1024.  MMK argues that the November 8, 2002 letter does not explicitly state MMK's intention to associate as a joint venture.  However, the letter from Pawloski states a desire for MMK and Thermodyn to both benefit from "this venture," and the Thermodyn & M&MK Relationship document delegates the duties and responsibilities that relate to the single enterprise of manufacturing and selling Lilypadz.  (Doc. 150 at ¶¶ 7-10; Doc. 157 at Ex. A-B).  Furthermore, some kind of business relationship existed between the companies that distributed the delegation of duties consistent

20

with the above mentioned documents: M&MK marketed, distributed, and sold Lilypadz, while Thermodyn manufactured them.

For the Third and Fourth elements, Thermodyn must allege a set of facts in support of a "community of interest and control, including contributions to the joint venture" and "the mutual right to direct and control the purpose of the joint venture." *Anchor v. O'Toole*, 94 F.3d at 1024. Thermodyn alleges that Thermodyn "came up with numerous modifications to the product . . . to assist in the development of the Lilypadz project." (Doc. 150 at ¶ 11). Also, the Thermodyn and M&MK Relationship document states that "M&MK can work with Thermodyn during this startup and Thermodyn can be asked to sit in on sales meetings with major Lilypadz customers." (Id. at ¶ 11). Furthermore, one of the reasons that Thermodyn has brought this Counterclaim is because M&MK "invested no funds in the project" and Thermodyn does not believe it was sufficiently compensated for its contributions. (Id. at ¶ 10).

Fifth, Thermodyn must allege a set of facts in support of "an agreement for the division of profits and losses-jointly, not severally." *Anchor v. O'Toole*, 94 F.3d at 1024. Thermodyn has satisfied this element with allegations evidenced by the Thermodyn and M&MK Relationship document which states that "[b]oth companies should expect to share in the costs as well as the success of the Lilypadz product." (Doc. 157 at Ex. B; Doc. 150 at ¶ 10).

Beyond this, MMK argues that Thermodyn's breach of joint venture claim should be dismissed against Individual Third Party/Counterclaim Defendants Pawloski and Bruce because Thermodyn fails to allege or provide factual support for such a claim. As explained above, this Court will not exercise personal jurisdiction over Bruce, and thus both of the counterclaims are dismissed as they relate to her. However, the charge is not dismissed with regard to Pawloski,

who played a significant role in the alleged breach as the author of the November 8, 2002 letter and the one who allegedly initiated and frustrated relations with Thermodyn. Thus, MMK's motion to dismiss the breach of joint venture claim is denied.

### b. Count II: Tortious Interference with Business Relations

"The tort of interference with business relationships generally occurs when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another." *Williamson v. Rexam Beverage Can Co.*, 497 F. Supp. 2d 900, 909 (S.D. Ohio 2007) (citing *Lambert v. Kazinetz*, 250 F.Supp.2d 908, 917 (S.D. Ohio 2003).

Thermodyn's counterclaim states that: (1) "Thermodyn had business relations with entities and individuals that were independent of [MMK]," including a European customer; (2) that MMK Defendants "had knowledge of these business relations"; (3) that MMK Defendants, through their attorney Benjamin Randall, Esq, "contacted a European customer and informed them of Thermodyn's alleged violations of the NDA"; and (4) that this interfered with business relations resulting in economic damages. (Doc. 150 at ¶ 21, 29, 30-32).

MMK argues that Thermodyn has failed to allege facts to support the existence of a business relationship between Thermodyn and the alleged European customer. "However, this tort is committed when a person causes a third party not to enter into a business relationship with another. Thus, the existence of a present business relationship is not an essential element of the tort." *Williamson v. Rexam Beverage Can Co.*, 497 F. Supp. 2d 900, 909 (S.D. Ohio 2007) (citing *Lambert*, 250 F.Supp.2d at 917-18) (denying the defendant's motion to dismiss when the plaintiff alleged a reasonable probability of business relationships, that the defendant was aware of these

22

relationships, and that in causing a patent application to be published the defendant intentionally interfered with these relationships).  As a result, Thermodyn Defendants have alleged enough to survive dismissal at this junction despite their failure to state the full nature of their business relationship with the European customer.  Thus, MMK's motion to dismiss the tortious interference with business relations claim is denied.

### 2.  Motion to Dismiss Sheshells Defendants' Counterclaims

### a. Count II[2]: Unfair Competition

A claim of unfair competition arises where a person "on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact', in a manner that is 'likely to cause confusion.'" *Bird v. Parsons*, 289 F.3d 865, 877 (6th Cir. 2002) (quoting 15 U.S.C. § 1125(a)(1)(A)).  The Sixth Circuit has explained that unfair competition arises where "one party fraudulently seeks to sell his goods as those of another." *Wisconsin Electric Co. v. Dumore Co.*, 35 F.2d 555, 557 (6th Cir. 1929).

MMK argues that SheShells Defendants fail to allege facts sufficient to establish a claim for unfair competition.  SheShells Defendants argue that they pled their unfair competition claim under Ohio common law which, unlike the federal standard, simply requires "unfair commercial practices such as malicious litigation, circulation of false rumors, or publication of statements, all designed to harm the business of another."  *See Landskroner v. Landskroner*, 154 Ohio App. 3d

---

[2]

 The Court begins its analysis with Count II.  SheShells Defendants voluntarily dismissed Count I (Misuse of Patent).  (Doc. 171 at ¶ 1).

471, 491, 797 N.E.2d 1002, 1017-1018 (Ohio App. 2003).[3] However, missing from both parties' analyses is that even if SheShells Defendants pled unfair competition under Ohio common law, "courts are to apply essentially the same analysis as that applied in assessing unfair competition under the federal statutes." *Cesare v. Work*, 36 Ohio App.3d 26, 28, 520 N.E.2d 586, 590 (1987); *see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc*., 78 F.3d 1111, 1122-23 (6th Cir. 1996).

Here, SheShells Defendants allege that MMK: (1) knew that their product was not unique; (2) knew that MMK had not conveyed confidential information or trade secrets to Thermodyn; (3) knew that there were many breast shield competitors; (4) brought no suit against other competitors who use similar breast shields as LilyPadz; (5) brought suit against SheShells although SheShells had only sold 138 units on the date of filing; and (6) brought this suit with the intent to eliminate SheShells from the marketplace. (Doc. 15 at ¶¶ 164-168).

None of these allegations show that one party fraudulently seeks to sell his goods as those of another. As a result, MMK's motion to dismiss the unfair competition claim is granted.

### b. Count III: Illegal Attempt to Monopolize

In *Spirit Airlines, Inc. v. Northwest Airlines, Inc*., the Sixth Circuit explained:

---

[3] SheShells Defendants rely on *Landskroner* to the extent to which the case outlines the legal standard, but neglect to recognize the court's application of that standard. In *Landskroner*, the court dismissed an unfair competition claim when the appellant "identifie[d] no 'business' that could have arguably been passed off as that of appellee's . . . [A]ppellant does not allege that [appellee] misrepresented its services to be that of appellant's or that [appellee] made other false representations about appellant to clients so as to cause appellant harm." 154 Ohio App. 3d at 491. Thus, even though *Landskroner* superficially gave a more generous reading of what might constitute an unfair competition claim, in application, the court required that the fundamental elements of such a claim be met.

Section 2 of the Sherman Act, in pertinent part, makes it unlawful to "monopolize, or attempt to monopolize, ... any part of the trade or commerce among the several States...." 15 U.S.C. § 2. "[Section] 2 addresses the actions of single firms that monopolize or attempt to monopolize.... The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Spectrum Sports Inc. v. McQuillan*, 506 U.S. 447, 454, 458, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Under this statute, the defendant must "use ... monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.' " *Eastman Kodak* [*Co. v. Image Tech. Servs., Inc.*], 504 U.S. [451] at 482-83, 112 S.Ct. 2072, 119 L.Ed.2d 265 [ ( 1992) ] (quoting *United States v. Griffith*, 334 U.S. 100, 107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948)).

431 F.3d 917 (6th Cir. 2005).

A claim for attempted monopolization requires: "(1) a specific intent to monopolize; (2) anti-competitive conduct; and (3) a dangerous probability of success." *Tarrant Serv. Agency, Inc. v. Am. Standard, Inc*., 12 F.3d 609, 615 (6th Cir. 1993); *see also Smith Wholesale Co., Inc v. Phillip Morris USA, Inc.*, 219 Fed.Appx. 398, 409 (6th Cir. 2007).  Market strength that approaches monopoly power, meaning the ability to control prices and exclude competition, is a necessary element for showing a dangerous probability of achieving monopoly power in an attempt to monopolize case. *Id*.

Courts have not adopted a uniform standard regarding the threshold of what it takes to establish a monopoly power.  *See e.g.Smith Wholesale Co., Inc v. Phillip Morris USA, Inc.*, 219 Fed.Appx. 398, 409 (6th Cir. 2007) (56% market share was insufficient); *Arthur S. Langendfelder, Inc. v. S.E. Johnson Co.*, 917 F.2d 1413, 1429-34 (6th Cir. 1990) (19%  - 29% market shares insufficient); *Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir. 1979) (finding that 75-80% or greater is a "starting point" in assessing monopoly power); *see also Richter Concrete Corp. v. Hilltop Concrete Corp*., 691 F.2d 818, 827 (6th Cir. 1982).  However, the Sixth Circuit has reasoned that "market share alone, however, is  not enough to determine a firm's capacity to

25

achieve monopoly. . . [t]he real test is whether [MMK] possessed sufficient market power to achieve its aims." *Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir. 1982) (citations omitted).

Here, SheShells defendants have alleged: (1) SheShells and MMK are competitors; (2) MMK is and has been engaging in the illegal attempt to monopolize a the selling of breast shield products in at least the nurse product line; (3) MMK seeks to become a dominant competitor in the breast shield production; and (4) SheShells has been damaged as a result of MMK's conduct. (Doc. 15 at ¶¶ 171-175).

Such allegations are insufficient to overcome a motion to dismiss.  SheShells has not alleged anything regarding MMK's capacity to impact the overall market.  In fact, SheShells' allegation that MMK "intends . . . to become a dominant competitor" in certain markets is effectively an admission by SheShells that MMK does not yet possess sufficient market power to control prices and exclude competition.

In addition, SheShells has failed to plead facts to establish a cognizable antitrust injury. *See NicSand, Inc. v. 3M Company*, 507 F.3d 442, 450 (6th Cir. 2007). "An antitrust claimant must show more than merely an 'injury causally linked' to a competitive practice; it 'must prove an antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful.'" *Id.*, (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).  The Sixth Circuit has held that a simple assertion of antitrust injury, without factual allegations supporting such an injury, are insufficient to meet the threshold requirement of Rule 8(a)(2).  *Id.* at 451. Courts allow claims such as the ones raised by SheShells "only when one of the rivals has engaged in some

26

form of predatory pricing or illegal tying--when the rival has engaged in something more than vigorous price, product or service competition." *Id.* (citations omitted). The antitrust laws were, after all, enacted for "the protection of competition not competitors." *Id.* (quoting *Brunswick*, 429 U.S. at 488).

Here, SheShells Defendants have failed to allege or identify any kind of predatory pricing scheme by MMK that has impacted competition in the breast shield market. As a result, MMK's motion to dismiss the illegal attempt to monopolize claim is granted.

### c. Count IV: Breach of Contract

Under Ohio law, the elements for breach of contract are: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Thomas v. Publishers Clearing House*, 29 Fed.Appx. 319, 322 (6th Cir. 2002). To prove the existence of a valid contract, the plaintiff must prove all the essential elements of a contract, including an offer, acceptance, the manifestation of mutual assent, and consideration (the bargained for legal benefit and/or detriment)." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 3 (2002). The plaintiff must also show that there was a "meeting of the minds" and that the contract was definite as to its essential terms. *Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus. Relations*, 61 Ohio St.3d 366, 369 (1991).

Here, SheShells Defendants allege: (1) prior to July 25, 2005, MMK offered Hass the right to purchase and re-sell Lilypadz; (2) Hass accepted MMK's offer; (3) in reliance on this contract, Hass invested in developing markets for the product; (4) MMK denied the existence of the contract by interfering with Hass' relationship with Boots; and (5) MMK's conduct damaged Hass. (Doc. 171 at ¶¶ 177-182).

MMK argues that SheShells Defendants mistakenly believe that a conditional offer that MMK made to SheShells in a September 16, 2004 price quote offer is a contract.[4]  MMK adds that SheShells did not comply with the conditions of the offer and thus no contract was formed. However, this does not mean, as MMK suggests, that the offer letter is conclusive evidence that no contract was formed because MMK claims for there to be no evidence of acceptance.  At this juncture, all of the well-pleaded allegations of the complaint must be treated as true.  *Lewis v. ACB Bus. Servs., Inc*., 135 F.3d 389, 405-06 (6th Cir. 1998).  SheShells alleges that Hass accepted the offer and that MMK violated this contract by denying its existence and interfering with SheShells' business opportunity with Boots.  Based on the foregoing, the Court finds that Plaintiff has adequately stated a claim for breach of contract under Ohio law. As a result, MMK's motion to dismiss the beach of contract claim is denied.

### d. Count V: Promissory Estoppel

"Under Ohio's promissory estoppel doctrine, a promise that the promisor 'should reasonably expect to induce action or forbearance on the part of the promisee or a third person and . . . [that] does induce such action or forbearance is binding' if one can avoid injustice only by enforcing the promise."  *Anderson, Inc. v. Cansol, Inc.*, 348 F.3d 496, 502 (6th Cir. 2003) (citing *McCrosky v. Ohio*, 8 Ohio St.3d 29, 456 N.E.2d 1204, 1205 (1983)).  To establish a claim of promissory estoppel, SheShells Defendants must show: (1) a promise, clear and unambiguous in its terms; (2) reliance on the promise by the party to whom the promise is made; (3) that the

---

[4]

Although it was not attached to the Counterclaim, the Court may consider this offer letter because SheShells incorporated it by reference into the Counterclaim.  (Doc. 171 at ¶¶ 177-178).  *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir.1997) (In a motion for judgment on the pleadings, courts may look at the pleadings themselves and exhibits "incorporated by reference into the complaint"); Fed. R. Civ. P. 12(c).

reliance was reasonable and foreseeable; and (4) SheShells Defendants were injured by the reliance. *Id.*

In the Counterclaim, SheShells Defendants allege: (1) MMK should have expected that Hass would rely upon MMK's promises and representations that Hass could repackage, rename, and re-sell Lilypadz; (2) Hass did in fact rely on MMK's promises to its detriment; and (3) SheShells suffered damages as a result.  (Doc. 171 at ¶ 177, 183-187).

MMK argues that because the September 16, 2004 price quote offer was conditional, SheShells Defendants have failed to allege a "clear and unambiguous promise."  In support of its motion, SheShells Defendants correctly cite *Faurecia Automotive Seating, Inc. v. Toledo Tool and Die Co., Inc*., 2008 WL 4425603 at *5 (N.D. Ohio 2008) ("To be 'clear and unambiguous,' the promise cannot be conditional") (citing *Anderson Inc. v. Consol, Inc.* 185 F.Supp.2d 833, 840 (N.D. Ohio 2001) aff'd by *Anderson, Inc. v. Consol, Inc*., 348 F.3d 496 (6th Cir. 2003)).  In both *Faurecia* and *Anderson*, the "conditional promises" were in the forms of letters of intent that conditioned agreements on further action of the parties.  *Faurecia,* 2008 WL 4425603 at *6 (the intent letter required final mutual agreement); *Anderson,* 348 F.3d at 503 (the intent letter required the successful negotiation of a definitive lease agreement*).*

Here, the September 16, 2004 price quote offer was conditioned on Hass's intention to pursue a "fashion only" agreement and for Hass to inform MMK of his intentions.  In view of such conditional language, SheShells Defendants cannot establish the presence of a clear and unambiguous promise.  Just as the court explained in *Faurecia*, "[w]hile the parties may have anticipated and even expected that they would reach such agreement, there was no guarantee that they would do so.  Absent such certainty, any assurances on [MMK's] part were conditional, and

29

manifested a possibility that a mutual agreement might not arise." *Faurecia,* 2008 WL 4425603 at

\*6. As a result, MMK's motion to dismiss the promissory estoppel claim is granted.

### e. Count VI: Unjust Enrichment

In their briefs, MMK and SheShells Defendants focus on whether SheShells Defendants'

claim for unjust enrichment fails because SheShells Defendants also allege the existence of an

express contract that covers the same subject of their claim for unjust enrichment. Ohio law

generally does not permit recovery under the theory of unjust enrichment when an express

contract covers the same subject. *See e.g., Hughes v. Oberholtzer*, 162 Ohio St. 330, 123 N.E.2d

393, 396 (Ohio 1954) (holding that it "is generally agreed that there cannot be an express

agreement and an implied contract for the same thing existing at the same time"); *Randolph v.*

*New England Mut. Life Ins*., 526 F.2d 1383, 1387 (6th Cir. 1975) (noting that such

quasi-contractual remedies are generally not available where the parties are bound by a valid and

enforceable contract). The reason for this is that "[e]quitable remedies permit the Court to give

legal force to the reasonable expectations of parties where they did not or could not form an

agreement manifesting their specific intent." *Comtide holdings, LLC v. Booth Creek Management*

*Corp.*, 554 F.Supp.2d 821 (S.D. Ohio 2008) (citing *Hughes*, 123 N.E.2d at 396).

Even in those cases, however, unjust enrichment may be pled in the alternative when the

existence of an express contract is in dispute. *Lightbody v. Rust*, 2003 WL 21710601, at \*8

(Ohio.App. 2003). It may also be maintained despite the existence of an express contract where

there is evidence of fraud, bad faith, or illegality. *Wolfer Enterprises v. Overbrook Development*

*Corp*., 132 Ohio App.3d 353, 357, 724 N.E.2d 1251 (1999).

In the case at bar, the existence of an express contract is in dispute. SheShells claims that Hass accepted MMK's September 16, 2004 offer, creating a contract. MMK claims that Hass failed to meet the conditions of MMK's offer, and thus, no contract was formed. As a result, the Court does not dismiss the claim on the grounds that SheShells Defendants allege the existence of an express contract that covers the same subject of their claim for unjust enrichment. Rather, the Court dismisses the claim because SheShells Defendants have failed to state a claim upon which relief can be granted.

"Unjust enrichment is an equitable doctrine that allows a party to pursue the reasonable value of services rendered upon another party when a benefit is conferred without an exchange of just compensation." *Cheers Sports Bar & Grill v. DIRECT TV,* 563 F.Supp.2d 812, 819 (N.D. Ohio 2008). Under Ohio law, to recover for unjust enrichment, a plaintiff must prove that: (1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of such benefit; and (3) the defendant retained the benefit "under circumstances where it would be unjust to do so without payment." *Anderson, Inc. v. Cansol, Inc*., 348 F.3d 496, 502 (6th Cir. 2003) (citing *Brown-Graves Co. v. Obert*, 98 Ohio App.3d 517, 648 N.E.2d 1379, 1383 (1994)).

Here, SheShells Defendants allege: (1) MMK received benefits from Hass to which MMK was not entitled; (2) MMK has been unjustly enriched to the detriment of Hass; and (3) Hass is entitled to damages. (Doc. 171 ¶¶ 189-190).

MMK argues that SheShells Defendants' claim for unjust enrichment fails because their allegations are devoid of (1) any assertion that MMK knew it was receiving a benefit that it was not entitled to receive, and (2) an explanation for why it is inequitable for MMK, rather than Hass, to have the benefit allegedly conferred upon MMK by Hass.

31

With regard to MMK's first point, the Court finds guidance in *Hoffer v. Cooper Wiring Devices Inc.*, 2007 WL 1725317, at *5 (N.D. Ohio 2007) and *Bird v. Delacruz*, 2005 WL 1625303, at *6 (S.D. Ohio 2005).  In *Hoffer*, the court granted the defendants's motion to dismiss because the plaintiff failed to "satisfactorily allege Defendant knew of any alleged benefit conferred by Plaintiff."  2007 WL 1725317, at *5.  In *Bird*, the court granted the defendant's motion to dismiss because the plaintiffs second amended complaint failed to allege that the defendant "knew it was receiving money it was not entitled to receive."  2005 WL 1625303, at *6.  Here, SheShells Defendants' Counterclaim not only fails to allege that MMK knew about a benefit that MMK was not entitled to receive, it also fails to identify the benefit that it allegedly conferred on MMK.  The Court's liberal reading of SheShells Defendants' Counterclaim is that SheShells believes that MMK's knowledge of a contract between MMK and SheShells Defendants should have precluded MMK from interfering with SheShells transactions with other companies.  While this is relevant to the breach of contract claim, unjust enrichment requires something more.  Unjust enrichment requires SheShells Defendants to allege that MMK knew that MMK was receiving a benefit that MMK was not entitled to receive.  As a result, MMK's motion to dismiss the unjust enrichment claim is granted.

## IV. Conclusion

For the reasons discussed herein, Counterclaim/Third Party Defendant Bruce's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) is granted (Doc. 156); Counterclaim/Third Party Defendants MMK, M&MK, Pawloski, and Bruce's motion to dismiss Thermodyn Defendants' Third Party Complaint and Counterclaims is denied (Doc. 157); and Plaintiff MMK's motion to

dismiss SheShells Defendants Amended Counterclaim is granted in part and denied in part (Doc. 181).

      IT IS SO ORDERED.

                                                  s/ *David A. Katz*
                                                DAVID A. KATZ
                                                U. S. DISTRICT JUDGE